The next case for argument is 162610, UCB v. Accord Healthcare. Now, appellants are splitting time. I'd like to focus my limited time here on three legal errors by the District Court, two of which were related to the double patenting case and one of which was related to the obvious case to purify part of the case regarding the event of standard. Mr. Greco will be addressing, on behalf of the Accord defendants, the structural obvious case. Can I just jump to the double patenting and ask you, I mean, we've got a fact-finding, a detailed fact-finding record by the District Court here, and on the double patenting issue, what are the top three reasons, for example, why you think he was wrong in concluding that there was no reasonable expectation of success? The first reason, Your Honor, is that effectively his finding made the 301 patent, the claims 44 and 45 of the 301 patent, invalid for lack of enablement. Enablement. Correct. The patent is presumed valid. The patentees represented to the Patent Office that the patent claims were valid and enabled in response to enablement rejections, and by finding that there was no reasonable expectation that a compound with methoxymethyl at the R3 position would be successful as an anticonvulsant, the court essentially found that those claims would not be enabled. That's not... For enablement, just for me to clarify, the full range of the embodiments covered by the those would have to have an expectation of success? No, but there was no... Under the court's reading, there would be no compound whatsoever that would fall within that claim. Not one that would fall within that claim that would be enabled. You're telling me that if I were to look at the enablement of that claim, I only have to find one embodiment that would be enabled in order to enable the claim? So it could be something other than what the claim convention is in this case? No, you would have to find... What you would have to find is, at a minimum, a representative species that would fall within the claim that would be enabled, and there would be none under the court's reading of that claim. There would be none because there would be no data on any compound that had methoxymethyl at R3. None. And the most obvious one would be the one with the unsubstituted methyl. And I think his reasonable expectation of success finding is just based on the lack of data? It was found based on the lack of data, and the lack of data specifically with a non-aromatic substituent at R3. A non-aromatic, carbon-based substituent at R3. So if the claim had... If claim 44 or 45 had an aromatic compound at R3, that might have been enabled, but that wasn't... That isn't what was at the R3 in claim 44. In the claim if you're going to look at the claimed invention and recreate. Correct. There was no... There is literally no compound that would have been enabled under the court's reading of what claim 45 said. What were your other two points, because your clock is running? Did you say you had three reasons? Yes. The second reason would be that the court made a clear error of law in discarding the available information regarding the 3L compound, which was the most potent compound at the time, and also in discarding the information in 729 patent and the data that was in there regarding the closest compound that Legall found to the methoxy methyl, which is compound 86B. When you say disregarding, the court talked about those. You just didn't like the way the court resolved the question of the applicability of those to this case. I think what he did was he concluded that nothing other than an aromatic, non-carbon-based compound would work or would be believed to have worked at the R3, and by doing that, he did not take into account the most potent analog or the most potent methoxy amino. You didn't say he didn't take into account. You really mean he discounted it because he didn't believe that they were particularly pertinent to the factual inquiry, right? Correct. Isn't that really a factual question, to get back to Judge Stoll's question? Yes, that is a factual question. We would be challenging that under the clearer rules. What about all of the work that Dr. Cohn had done beforehand? What about the district court's treatment of that information? Because it seems that you did have quite a bit of information, quite a factual record, with regard to the experimentation done by Dr. Cohn. Correct. And the experimentation that was done by Dr. Cohn suggested that not just an aromatic compound would work, but that also non-aromatic compounds would work, and compounds with a carbon base would also work at the R3 position. But hadn't the evidence up to the time of the patent suit really indicated through Dr. Cohn's work that the polar analogs did not have strong potency, and it was really the aromatic and the heteroaromatic constituents that actually carried the greatest promise? That's correct, but to say that... You don't quarrel with that. Right. I don't have a quarrel with that, but I do have a quarrel, except for the methoxyamino compound was the most potent, and that was... As it turns out. Right. Well, and that was published. That was published and available as prior art, that the methoxyamino was the most potent. In fact, that's what the post-invention guys were using as kind of the comparator. But I think the art did not exclude at all the use of the methoxymethyl, which is, again, for double patenting purposes, we assume that's constant. And the polar analogs, for example, compound 86B were actually published as having comparable potency to marketed drugs, to drugs that were on the market and being sold in 1996. The compound 86B, I think, had an ED of 50 of 61, and a marketed drug that it was compared to in the table was 62. So it had... It may not have been the best, but it certainly was in the realm of a viable compound to use as an anticonvulsant as it was comparable to what was already on the market in 1996 and being sold. So for that reason, I think he... It's clearly erroneous to disregard or not count the evidence related to non-aromatic groups at the R3. I don't recall this specifically, but was compound 86B one of the compounds as to which there was a concern of liver toxicity? I don't believe there was any data on compound 86B with regard to liver toxicity. And that's the compound that Legall, when he published compound 107E, predicted the activity of 107E as well. So this is not a circumstance... There was no data. He had no data on 107E. Correct. He had no data on 107E. He just said it might have a positive result. Right. What he was doing was looking at the compounds he was testing, including 86B, and from that examination, had decided that and declared that he thought that 107E would also, being structurally similar to 86B, would be one with anticonvulsant activity. When was the first time that methoxymethyl at the R3 came up in the prior R? The only time it did is in the 301 patent, Your Honor. Well, I'm sorry. No, I'm sorry. In 1987, Legall published it in his thesis. But other than 107E, did it ever show up before the 301? It did not show up before the 301. Technically, it's not prior R, I guess. Correct. It was in the thesis, it was in the Legall thesis, and then it was in the 301 patent. But nowhere else? Nowhere else. So just to clarify, 301 is not prior R? The 301 patent is a double patenting reference. I understand in this case, it's a double patenting reference. But technically, is it prior R? It is not prior R. The specification is shared with the 729 patent, which predated it, and that is prior R. So the claim in the 301 with the 729 specification is the double patenting case. Thank you. Thank you. Mr. Greco, you've got four minutes. Good morning, Your Honors. May it please the Court, my name is Richard Greco. I represent the Court Health Care and Intense Pharmaceuticals. And I'd like to first address the issue of obviousness. The claims of the patent in this case are obvious because there is no difference between the objective scope of the claims and the literal teachings of the prior R. The claims in issue are to the R stereoisomer of a prior R structure known as 107E and its use as an anticonvulsant. The prior R of all pieces taught 107E as a member of a class of anticonvulsants, stated that it may have good activity, taught that the R stereoisomer of the parent compound of 107E and another close relative was 13 times more potent than the S, and expressly stated that you had the choice of making separate stereoisomers. The prior R.729 patent done by the plaintiffs confirms that 107E and its R stereoisomer is an effective anticonvulsant because it is included in the formula claimed as such. That patent also teaches the R stereoisomers preferred. Anyone who read LaGalle and the 729 patent would already know exactly what is claimed in this case, that the preferred R stereoisomer of 107E was an anticonvulsant. Now, rather than showing an objective difference between the prior R and the claims as required by the Supreme Court test, the plaintiffs in the court below applied a subjective standard of trying to determine what a person of ordinary skill in the art would prefer to select to develop or would find most promising. The problem with that standard is it doesn't address the basic issue of obviousness. Is the claim new, or is it something that was already taught in the prior art? As I understand it, it's a lead compound analysis, that's what's been said. That's right. Do you agree that there should have been a lead compound analysis? No, I think the lead compound analysis, and this is... Just inapplicable in this case, or is it just never should be applied? The lead compound as defined in the Otsuka case, I believe, is incorrect. And I've been straight up on that in my brief, that it's inconsistent with KSR, it's inconsistent with Ray Dillon. And here's the reason why. That kind of analysis doesn't compare the claim to the entire prior art, but only to a narrow subset of the prior art. That's carved out on the basis of a retroactive judgment of what a person of ordinary skill would have preferred to develop. In fact, it allows an old idea that's fully known and fully developed in the art to be claimed as an invention, as long as that wasn't one of the preferred pieces of prior art. And that can't be right. And it's made clear here, I think, in the opinion below, by the court's ruling that no functionalized amino acid compound could be a lead compound. In effect, saying that in spite of the patent and the numerous articles about functionalized amino acids and all the teachings of how to make them and how to change them to make new ones, nothing could be obvious in that field because it hadn't been approved by the FDA. That just doesn't make sense in terms of what an invention is. The plaintiffs also deal with the 729 patent by suggesting this is simply a classic case of separate genus and species patent. But that doesn't really fit here because 107E was known in the prior art. The plaintiffs did not claim a new species that they derived from the genus of the 729 patent. That was already known. It did not have to be derived from the genus. What they claimed was the preferred and obvious version of a known chemical species. I wanted to do anticipation, but I'm out of time unless the court wants to hear briefly on that. I think we're good. Thank you. Okay, thank you. Good morning. Good morning, Your Honors. Demetrius Rivas for UCB Research Corporation in Paris. There is one critical difference between the 551 patent and the 301 patent in all the prior art, and that is that the claimed compound in the 551 patent is for chronic administration, and that was proved with liver toxicity data, which does not appear anywhere in the prior art. Liver toxicity was a side effect that plagued all epilepsy drugs. Epilepsy is a heterogeneous disease. The causes are unknown. It differs from patient to patient, and it is so difficult to develop drugs in this area that the NIH set up its anti-convulsant screening program. From 1975 to 1996, 16,000 compounds were tested, and only one was FDA approved. One year after approval, they had to issue a black box warning because of its side effects on liver toxicity and aplastic anemia. So this is a terribly unpredictable area. If I could address the double patent issue. I'm a little confused about the way you began, because I thought that the issue of liver toxicity and the therapeutic effect of the drug was confined to, not to Claim 9, but to Claim 10. Are you now making an argument that that same liver toxicity factor applies to Claim 9, or are you just focusing on Claim 10 now? Focusing on Claim 10, there is a specific term in Claim 10 that says therapeutic composition. Yes, and I understand that argument. It's just when you led off with that, it seemed to me you were leading off with an argument which doesn't show up until about page 58 of your brief. Well, if you read the specification of the 551 patent, it distinguishes all other functional amino acids that came before it as not being suitable for chronic administration. That may be, but 9 doesn't require a composition that's suitable for chronic administration, right? It doesn't require, but that is one of the properties of that drug, that prior art compounds don't have, and we're shown that. Certainly in Claim 10, it is there, and that claim construction is uncontested. Okay. So going through the double patenting issue and the 301 patent and the 551... Can you address the first thing we addressed with your friend on the other side, which was the enablement question on 301? It's not a question of enablement. It's IC double patenting. The 301 patent, Claim 45, covers millions of compounds. And the question really is, is Claim 9 of the 551, does it cover a patently distinct species within that huge genus? And the answer is yes. But why don't you answer my question? I know you find you can come up with other questions and answer your own questions, but what about my question about it, whether or not 301 is enabled? It is enabled. It is enabled for anticonvulsants generally. It doesn't have to enable every single compound within that huge genus. And a person of ordinary skill in the art looking at that genus would have to select, assuming that R3 is kept constant in 301, Claim 45, within the methoxymethyl group, the person that's still in the art would have to select R and R1 to put on that compound to get to Claim 9 of the 551. The argument is, well, benzyl and methyl were used in the prior art, and that should direct the person of ordinary skill in the art. But McGaugh's thesis, the polar group compounds all had terrible activity, and they had benzyl and methyl on the two ends, not with methoxymethyl, but with other polar groups. So a person of ordinary skill in the art looking at that would not be able to say, well, then benzyl and methyl are the obvious choice for methyl methoxy because those compounds exhibited terrible activity. Then the question is 86B. 86B was not a polar group compound. It had a nitrogen in there. Can I go back to the enablement question for a minute? Yes. Could you maybe explain why? Does the full scope of the claim have to be enabled in order for the claim to be enabled, or why is it? How do you respond to your adversary's specific statement that as a result of that claim is not enabled? What had to be enabled and what didn't? What was the requirement there? What had to be enabled is a genus of compounds that exhibited anti-convulsant activity with this general chemical structure, and that is enabled. How do you know that? How do we know that? Well, there is no example that they've come forward where it doesn't work specifically for anti-convulsive activity. Some anti-convulsive activity. Some are not good. Some are better than others. You don't have to enable the entire scope of the claim. If there's one compound that doesn't work as well as another, that doesn't defeat enablement. To go to the argument that's I guess the simplest form of the argument that's made by your adversary in the brief, you've got the R3 is fixed per claim 45, I guess of the 301, so we're starting out with that as the baseline. Then what you're left with is benzyl at R and methyl at R1 and the enantiomers, but the enantiomers wash out. I think we can all agree that that doesn't give you a patently distinct basis for arguing that the glucosamide is different from what's in the prior R, right? You're not hanging your hat on the enantiomers, right? All right. So why isn't it enough to bring into question Judge Stark's conclusion that the 729, which is prior R, says that the most preferred component at the R is benzyl and the most preferred component at the R1 is methyl? Well, 729 says unsubstituted or substituted benzyl, and there are the fluorobenzyl compounds which show a greater protective index than those with benzyl. So one skilled in the art would assume that perhaps fluorobenzyl or some other unsubstituted benzyl, which is subsumed in a 301 claim, would be a better selection for making a compound. So that's the basic distinction on which you're predicating your cases, is the possibility that the 729 includes both substituted and unsubstituted forms of benzyl and methyl. That's one of them. What's the other, though? I think we eliminated everything else, didn't we? Then again, the question is, is claim 9, which is one compound, the r-enantiomer glucosamide, patently distinct from that genus? Right. But the genus has been narrowed by the R3 being fixed, and if you agree with your opposing counsel, the R1 and the R being fixed as methyl and benzyl respectively. What's another argument besides the one you just made about substituted and unsubstituted? R1 and R are not fixed. The claim has a choice of millions. No, no, but fixed by the references to the most preferred substituents at R and R1. You said you had other arguments besides the unsubstituted. What do you have? The teaching is a general teaching with many different R3 groups. The selection of which of those two substitutions will be best with a select R3 group is not enough. But we're starting with a fixed R3. I thought we agreed on that. Yes. Okay. So what we're left with is R and R1, correct? Correct. Okay. And we are told by the 729 that the most preferred at R is benzyl and the most preferred at R1 is methyl. Now you tell me, ah, but there is substituted and unsubstituted forms of methyl and benzyl. And then I said, well, is that it? And you said, no, no, there are other things. What? I come back to my question, what else? Looking at the R's, would look at the different publications, understand that those two groups were fixed in order to study the effect of R3 and changing R3 in that compound. Does the 729 patents say that? I mean, one thing I thought in looking at the 729 patents, there's other embodiments disclosed where they change R and R1 from the preferred methyl and benzyl. So, I mean, I don't have a chemical background, but is there teachings in the 729 patent to have things other than, are there other preferred embodiments where R and R1 are different? I don't know if they've been described as preferred embodiments. There are other different embodiments. But when you fix R3 and vary the other groups and don't vary the other groups, you're really looking just at R3 and its effect. So you don't know what the effect of changing the different other R groups would be. So a person of skill in the art would not have any teaching as to what would be best with methoxymethyl. Because there is totally no teaching as to what the best R groups on methoxymethyl are. So as I understand your argument, you're saying maybe it's obvious to try, but there's no reasonable expectation of success? There is no reasonable expectation of success at all in this field. And I would say there's a reasonable expectation. But you said, you used the word oddly, you used the word that it was the best. I mean, reasonable expectation of success doesn't mean required that you establish that it was the best, right? That's right. But in this field, where everything is unpredictable, and it's these phenotypic tests, there is no structure analysis, because the mechanism of epilepsy and how these drugs work is unknown. So you have to test each compound in these phenotypic tests to see what's going on. And you can't possibly draw a conclusion from that. And that's why the furanil compound, which was the best, turned out to be highly toxic to the liver. And that's what the prior art teaches. Surprisingly and unexpectedly, this methoxymethyl compound didn't have those liver toxicity problems. Yeah, I know the furanil had toxicity problems. Am I wrong? And my vague recollection from the record was that AB6B had toxicity problems. Is that wrong? I didn't ask your opposing counsel. I just wanted to see if I'm... I don't think it was tested for toxicity. Okay. That's fine. I am wrong, I think. Thank you. All right. So turning to the obviousness issue, one ordinary skill in the art, the court in an extensive decision, 96 pages, 50 pages of finals of fact, concluded that a person of ordinary skill would not select 107E as a lead compound or 3M. They would look to FDA-approved drugs to try to change those drugs or some compound that had gone into clinical trials and had some data surrounding it. There was absolutely no data on 107E. Whatever Legault said in his thesis comparing 107E to the 86B compound was pure speculation. And in the intervening years, nobody did anything with 107E. In fact, when they came up with leucosamide finally and went to these same leading drug companies to develop leucosamide and offer it for a license, they turned to death because they thought it would be toxic, they didn't know its mechanism of action, and for other reasons that they just thought it would not be the compound to take forward. And that is indicative of what a person of ordinary skill in the art would select as a lead compound. If the drug industry that was developing these compounds was turning this compound down, even after they had data, that to me is probative of what a person of ordinary skill in the art would select as a lead compound going forward in the drug development program. And they just don't meet that grade in their obvious determination. As far as anticipation, these claims of the 551 patent are not anticipated by the Legault thesis. There was absolutely no data. It was no indication that the R enantiomer at that time in functional amino acids would be the one to select. That publication by Dr. Cohn came after the Legault thesis. So there was no motivation there. Thank you. Thank you. With respect to the enablement, just to be clear, I think we've got four minutes left on rebuttal, right? With respect to the enablement position by UCB, the statement that the entire scope of the claim is enabled means, as a matter of law, that anything that falls within the scope of Claim 44 we would reasonably expect success with. So if the entire scope of the claim is enabled, as counsel admitted, then anything that falls within there you would reasonably expect to work as a anti-convulsant drug, which is what is described as the utility in the 301 patent and is also described in the 729 patent as the goal of these functionalized amino acids. But there is a huge range and levels of success, it would seem to me, in this field. And one of the things that emerges from the record quite clearly is that there are a lot of drugs that have some potency, but very few drugs that have really strong potency and no toxicity. The ED50, I guess, is the measure of that. Correct. I think that's... To finish the question in a sense, why isn't it sufficient to say there's no reasonable expectation of success to say that there's no reasonable expectation of exceptional success within a large number of species as to which there is some modest degree of success? I think that's... So, I don't think it's necessary to say that the whole scope of the claim is enabled or you would reasonably expect success with the entire scope of the claim when you can expect success with the most obvious of the species that falls within that claim. The most obvious species that falls within that claim is unsubstituted methyl, which the court found was the only thing that worked, and unsubstituted benzyl or two types of substituted fluorobenzyl. So, basically, on the benzyl, on the R-substituent, the only choices that were shown to work in other compounds well were the unsubstituted benzyl and the fluorinated benzyl, the two types of fluorinated benzyl. So, you have three choices there. There's no requirement that each of these be... There's no requirement in the law for that. So, the most obvious compound would be either with the methoxymethyl at the R3 with either the unsubstituted benzyl or one of the two fluorinated benzyls and definitely the unsubstituted methyl, which the court found as a fact was the only thing that worked on the R1 substitute. To bring you back to the point that I was talking with Mr. Grievous about, on column 5 of the 729, the reference to the preferred use of benzyl at the R and methyl at the R1, Mr. Grievous said that included both substituted and unsubstituted benzyl and methyl. Do you agree with that? I agree with that. There's a spot in column 3 where it says preferred is unsubstituted or you can also have substituted. I see. But if you look at the data in the patent, the data in table 1 of the 729 patent, 54 compounds were tested. Only 49 of those 54 had unsubstituted benzyl. Only 5 had substituted benzyl, the fluoro substitutions, and only 2 of those fluoro substitutions showed as good activity as the unsubstituted benzyl. If there's nothing further? No. Thank you. We thank both sides and the case is submitted.